IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| ELIJAH ISAIAH TAYLOR,<br>Petitioner,<br><br>v.<br><br>LORIE DAVIS, Director, TDCJ-CID,<br>Respondent. | )<br>)<br>)<br>) No. 3:16-CV-149-N<br>)<br>)<br>) |

## FINDINGS, CONCLUSIONS AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

This cause of action was referred to the United States Magistrate Judge pursuant to the provisions of Title 28, United States Code, Section 636(b), as implemented by an order of the United States District Court for the Northern District of Texas. The Findings, Conclusions and Recommendation of the United States Magistrate Judge follow.

### I. Procedural Background

Petitioner filed this petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. He challenges his conviction for capital murder. *State of Texas v. Elijah Isaiah Taylor*, No. F11-40599-K (4th Dist. Ct., Dallas County, Tex., Mar. 23, 2012). Petitioner was sentenced to life in prison.

On August 13, 2013, the Fifth District Court of Appeals affirmed Petitioner's conviction and sentence. *Taylor v. State*, No. 05-12-00540-CR, 2013 WL 4081422 (Tex. App. – Dallas, 2013, pet. ref'd). On December 18, 2013, the Court of Criminal Appeals refused Petitioner's petition for discretionary review. PDR No. 1173-13.

Page -1-

On January 19, 2015, Petitioner filed a state petition for writ of habeas corpus. *Ex parte Taylor*, Application No. 83,101-01. On December 16, 2015, the Court of Appeals denied the petition without written order on the findings of the trial court.

On December 31, 2015, Petitioner filed this federal petition. He argues:

1. The trial court failed to impanel twelve jurors;

2. The trial court failed to comply with article 36.27 of the Texas Code of Criminal Procedure;

3. The trial court erroneously denied his request for a lesser-included offense instruction on felony murder;

4. The trial court's application paragraph in the jury charge omitted the allegation "unlawfully," where during the grand jury proceeding, both "unlawfully" and "intentionally" were alleged;

5. He was denied effective assistance of counsel at trial when his attorney failed to: (a) convey plea bargain offers; (b) file motions; (c) make an opening statement; (d) call a psychiatrist as an expert witness; (e) object and preserve error regarding the trial court's failure to communicate a jury note; and (f) object to the application paragraph in the jury charge; and

6. He was denied effective assistance of counsel on direct appeal when his appellate attorney failed to raise an obvious and significant issue on appeal that would have resulted in a reversal of his conviction.

On June 14, 2016, Respondent filed her answer. Petitioner did not file a reply. The Court now finds the petition should be denied.

## II. Factual Background

The following factual background is taken from the appellate court's decision.

Dabrawme Gardner testified that she and her family, including her twenty-one-year-old son, Adrian Berry, moved to Dallas County, Texas, from New Orleans in 2005. In December of 2010, Berry was living with his mother Dabrawme, his step-father Michael Lee Gardner, and his six-year-old sister in apartment 162 of the Tri Pointe Square Apartments on Samuell Boulevard in Mesquite, Texas. Both Dabrawme and Michael Gardner suspected that Berry, who often smoked marijuana, sold drugs.

Michael Gardner testified that he last saw Berry at around 10:40 p.m. on the night of December 20, 2010. Approximately ten minutes after Berry left the apartment, Michael heard "anywhere from six to nine" gunshots in "pretty rapid" succession. Dabrawme also recalled hearing "a lot of gunshots around my house." She was not sure of the number but testified "[i]t was a whole lot" and "not like just a random one or two shots."

Upon hearing the gunshots, Michael immediately went to the apartment window and saw a white Nissan Altima backing out of a parking spot and "heading out" of the apartment complex. The vehicle's head lights were turned off. He could not tell how many people were in the car and did not see anyone running to the car. Michael searched the area and found Berry on the other side of the building lying face down on the ground. On cross-examination, Michael added that, as he exited the apartment, he also saw a blue pickup truck speeding out of the driveway on the other side of the building onto Samuell Boulevard.

Devon Elijah Roberts testified pursuant to an immunity agreement with the State that on December 20, 2010, he went to Mesquite to buy "Kush," a more expensive grade of marijuana, from Berry. Roberts was accompanied by his cousin, Anthony Roberts, and Anthony's friend, appellant. Anthony drove the three individuals in what Roberts recalled was a Nissan "Maxima, I believe," that he had borrowed from appellant's girlfriend; appellant sat in the passenger seat. When they reached Berry's Mesquite apartment complex, Anthony and appellant got out of the car, and Roberts moved to the front seat and drove to the area near Berry's apartment. He pulled into a parking space near apartment 162.

Berry was already standing outside of the apartment when Roberts parked the car. He was wearing "basketball shorts, it looked like," and shoes, but was not wearing a hat or shirt. Roberts thought it looked like Berry was "fixing to get dressed." Roberts opened the driver's side door, Berry "stepped in the door" between Roberts and the door, and they exchanged $20 for one gram of "Kush." The next thing Roberts remembered was hearing someone yell "drop out," which means a person is being robbed. Roberts saw Berry running to the back of the car, with Anthony and appellant chasing him. Roberts heard multiple gunshots "instantly." Roberts further testified that the episode happened too quickly for him to see whether Anthony and appellant were armed. Reminded of an earlier statement to the police that he saw Anthony and appellant with guns in their hands, Roberts testified that he saw both Anthony and appellant with guns in their hands. Berry died as a result of a single gunshot wound to the back.

Roberts ducked down inside the vehicle when he heard the gunshots, and then put the car into reverse. As he drove out of the parking lot, Anthony ran in front of the car. Anthony and appellant jumped in the car, and Anthony told Roberts, "[G]o, go, go." Appellant held a chrome revolver in his hand when he got in the car, and Anthony also had a revolver. Devon asked them what was going on. Anthony said he had "blacked

out," and appellant said nothing. Roberts, who was on parole, recalled telling Anthony: "I got to get away from y'all, you know. Y'all need to, you know, let me out, man, you know." Roberts insisted he had nothing to do with the robbery and that he did not know Anthony and appellant were going to rob Berry.

Sandra Elisabete Abrieu testified that she had been living at the Tri Pointe Square apartments for six months when these events took place. On December 20, 2010, at around 10:45 and 11:00 p.m., as she walked outside her apartment to put a visitor permit in her guest's car, she saw two men standing on the sidewalk to her left. The taller of the two men wore a light-colored sweatshirt with a hoodie and had a black gun in his hands. The other man wore a darker color, and she could not see whether he had a gun. Within a few seconds, she saw the two men shooting towards Samuell Boulevard at another man who was running from the parking lot down the sidewalk.

Abrieu could not tell "if only one gun was shooting or more than one because it was very quick." She heard four or five gunshots in rapid succession. She hid behind a car to protect herself when the shooting started, and continued watching through the vehicle's windows. The two men fled the apartment complex in a light-colored car that looked like a Nissan Altima. The police arrived shortly after that.

Samuel Arroyo, a security officer at the Tri Pointe Square Apartments, also heard the gunshots. He was patrolling the complex on foot at around 10:45 or 10:50 p.m. on December 20, 2010, when he heard multiple gunshots in a "non-orderly pattern" that, to Arroyo, sounded "like more than one pistol" was being fired. Arroyo immediately took cover and looked south towards Samuell Boulevard. From his hiding place, he saw "the guy who got shot" run cross the street and fall to the ground several seconds later. Arroyo called 911. While he was on the phone with the 911 dispatcher, he saw a blue Chevrolet pickup truck "driving at full speed out of the property." He went over to the shooting victim and was standing near him when the first police officer arrived approximately five to seven minutes later.

The lead officer on the case, Arthur Daniel Keele of the Mesquite Police Department, testified that he initially identified a man named Steve Skillern as a suspect. Skillern supplied Berry with "Kush" (by mail) and had come from California to visit Berry at the time of the offense. He was listed in Berry's cell phone as "Steve Money," and Berry's phone records showed missed calls as well as a text message from Skillem to Berry saying, "What up, bro? I'm out here," shortly after the 911 call. But Keele ruled out Skillern as a suspect because records from one of Skillem's cell phones showed he was three miles away from the crime scene at the time of the first 911 call at 10:50 p.m. Video from a gas station surveillance camera also showed him several miles away shortly before the shooting.

Continuing to examine Berry's cell phone records, Keele focused on the phone

number associated with an individual known as "West D," who had been talking to Berry just before the shooting. Information obtained from MetroPCS, the service provider for "West D," showed that the account was listed under the name "Pacc Big," and that the subscriber's date of birth of "9–11–86" was the security question for the account. After obtaining the phone records for the account, another Mesquite police officer called one of the numbers shown on the records for "West D's" phone number and reached the voicemail of a woman named Samantha Roberts. Keele searched the name of Samantha Roberts in the police's computer databases and found that she had a son named Devon Roberts who was born on "9–11–86." The information he acquired during his investigation led Keele to believe Devon Roberts was the "West D" in Berry's phone.

Devon Roberts was brought to the police station for questioning on December 28, 2010. After interviewing Roberts, police officers arrested him for Berry's murder. The information Roberts provided to officers led them to Roberts's cousin Anthony, also known as "Arack," and appellant, also known as "Savage." Police officers arrested Anthony on December 29, 2010, and appellant was arrested at around midnight that same day. Keele filed murder charges against Anthony and appellant. The charges against both men were later refiled as capital murder.

In addition to the testimony from witnesses at the crime scene and testimony from law enforcement officers regarding the investigation, two witnesses testified that they heard appellant talk about robbing and shooting someone. Lonnie Marsalis Griffin, incarcerated at the time of appellant's trial on unrelated drug charges, testified that he dated appellant's sister and was living with her when he met appellant in November of 2010. He testified that appellant spent time at their apartment and went with him to deliver drugs. When appellant came to stay with them shortly before the 2010 Christmas holiday, Griffin thought appellant was "hiding out," and he "asked him about it." Griffin testified:

> He told me he had did something bad and, then, I was, like, all right. I would like—he ain't wanted to talk to me in front of his sister so we had took a ride. We had went to Oak Cliff, and on the way to Oak Cliff he had told me what happened. He told me that he had tried to rob someone and in the process the fella got shot, but at the time he did not know if the fella—I mean, if the person had got killed or not. He was just, like, they had robbed him and they shot him, and he ain't know if he got killed or not.

Griffin also testified that he discussed this issue with appellant again after he discovered the police were looking for appellant and had searched the home of appellant's sister. Griffin explained that a friend, Tyrone Brown, was present when this conversation took place. According to Griffin, appellant provided the following details regarding the offense:

Page -5-

> He said they went to—he said, umm—Arack's cousin had just got out of jail and he was in need of some money, and he said he had—he had somebody they can rob or whatever, and Arack called him and they all teamed up to do it. They used— they used—I can't think of her name right night now—they used the car. They used Cheyann's car. That's her name. They went over to Teela's apartment and asked Cheyann could they use the car for a dime sack of marijuana, and she told them, okay. They went to Mesquite. They drove to Mesquite, and when they got to Mesquite, whoever the dude was that they was looking for, he wasn't answering the phone, so they had rode around the apartments and they ended up running into him, and when they ran into him he came up to the car, and as he came up to the car they was talking, and that's when they commenced to rob him, and the—the dude, he had took off running and—Elijah had took off running after him and grabbed him, and they started scuffling, and the dude broke free of the scuffling. He said he had shot. He didn't know if he killed him or not. He said he had shot though. He had shot. Arack had shot, also, and he said the dude ran around the corner and they didn't follow him around the corner because they didn't know if he had a gun on him or not, and they got back in the car and took off.

Griffin further testified that appellant told him the initial plan was to rob someone in Mesquite of marijuana. But it never made sense to Griffin that appellant and the other man, who Griffin identified as "Arack," would plan to rob someone of marijuana because "a pound of marijuana is not a lot of money in it." Griffin then told the jury:

> They had—I guess, out on the run, the plan was to rob him in the apartment. The plan was to go into the apartment and rob him in the apartment and just take what he had and run, but—but he—I guess the guy probably, kind of, felt that it was going to happen, so, he wouldn't answer the calls. They had rode around the apartments and they looked for him, and when they looked for him the plan was to talk to him and get him outside at the car. They wasn't—I don't believe they wanted to kill him, at first, but they plan was to, you know, like take him into the apartment and rob him and get what he had, but it didn't go that way.

Griffin added that appellant told him he fired his weapon at the victim and thought he had hit him because of their close proximity, and that, after the offense, appellant tried to throw the gun off of Interstate 35 into the Trinity River.

Another witness, Tyrone Dorsey Brown, testified that he was a childhood friend of Griffin and that he met appellant through Griffin. Brown testified that he first "heard about it" from Griffin. Later, when Brown was in the car with Griffin and appellant, appellant stated that he and "Arack" attempted to rob and then shot at "the dude"; "Him and Arack was out of the car and the dude walked up, and the dude—they started tussling. The dude got away and was running, and they started shooting, and that was it." Brown added: "He didn't know if he had hit him. He didn't say—he just said they shot. He didn't

say if he hit him or if Arack hit him. He said they were shooting." Brown also testified that he knew appellant had a .38 revolver because he had "seen it before."

When recalled by the defense, Roberts was questioned regarding alleged inconsistencies between his trial testimony and his earlier statements to the police. Roberts testified he did not remember telling the police "I don't want to go to prison, what can I tell you?" He also denied telling the police that he wanted to be a "good witness" for them in this case; denied telling them he wanted to help the State because he had "messed up;" and denied telling the prosecutor he was "not going to give all and get nothing ... in return." Roberts also testified he did not recall giving police officers several different accounts of what happened. After defense counsel showed Roberts "some of the videos" outside the presence of the jury to refresh his memory, Roberts testified he did not recall much of his interview with the police because, at the time, he was high on marijuana "and nervous and scared at the same time." The trial court subsequently admitted, and the jury was shown, portions of interviews Roberts gave to the police on December 29, 2010, and to the prosecutor and two detectives on October 22, 2011, during which Roberts implicated his cousin, Anthony, and appellant in the shooting.

The defense also recalled Keele, who acknowledged that Roberts initially provided officers with a different version of events. According to Keele, Roberts first stated he was not even there and did not know what Keele was talking about, and then said he was there but nobody else was with him. Roberts then told Keele that he was there when two random individuals came up and started shooting, and he did not know who they were. It was not until Keele stepped outside with Roberts to take a "smoke break" that Roberts started providing officers with his "final version of what happened." But Keele testified that there was no recording of this conversation because it occurred while the two of them were outside of the interview room. On cross-examination, Keele testified that it is not uncommon for people to lie during police interviews and that people commonly mitigate their own involvement and that of people related to them even after they start telling the truth. In that regard, according to Keele, Roberts was no different than any other person Keele had interviewed.

At the conclusion of the evidence, the jury found appellant guilty of capital murder, and the trial court sentenced appellant to life imprisonment.

*Taylor v. State*, 2013 WL 4081422 at *1-5.

### III. Discussion

1. **Standard of Review**

The pertinent terms of the Antiterrorism and Effective Death Penalty Act of 1996 (the AEDPA), 28 U.S.C. § 2254 provide:

> (d) An application for writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in a State court proceeding.

*See* 28 U.S.C. § 2254(d). Under the "contrary to" clause, a federal habeas court may grant the writ of habeas corpus if the state court arrives at a conclusion opposite to that reached by the United States Supreme Court on a question of law or if the state court decides a case differently from the United States Supreme Court on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 380-84 (2000). Under the "unreasonable application" clause, a federal court may grant a writ of habeas corpus if the state court identifies the correct governing legal principle from the United States Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. *Id.*

### 2. Procedural Bar

Respondent argues Petitioner's claims that (1) the trial court failed to impanel twelve jurors; (2) the trial court failed to comply with article 36.27 of the Texas Code of Criminal Procedure; and (3) the trial court's application paragraph in the jury charge omitted the allegation "unlawfully," are procedurally barred because Petitioner failed to raise the claims on direct appeal and the state habeas court found the claims procedurally barred.

Federal courts may not review a state court decision that rests on an adequate and independent state procedural default, unless the habeas petitioner shows cause for the default and

"prejudice attributable thereto" or demonstrates that the failure to consider the federal claim will result in a "fundamental miscarriage of justice." *Harris v. Reed*, 489 U.S. 255, 262 (1989). When the last state court to review a claim clearly and expressly states that its judgment rests on a procedural bar, the procedural default doctrine generally bars federal review. *Id*; *Lowe v. Scott*, 48 F.3d 873, 875 (5th Cir. 1995).

In this case, although Petitioner raised these claims in his state habeas petition, he failed to raise the claims on direct review. The state habeas court found the claims procedurally barred because Petitioner was prohibited from raising claims in his habeas petition that could have been raised on direct review. *Ex parte Taylor* Supp. at 1-7.

To overcome the procedural bar, a petitioner must demonstrate: (1) cause for the procedural default and actual prejudice as a result of the alleged violation of federal law; or (2) that failure to consider the claims will result in a "fundamental miscarriage of justice." *Pitts v. Anderson*, 122 F.3d 275, 279 (5th Cir. 1997) (citing *Coleman*, 501 U.S. at 750). Petitioner has shown no cause for his failure to present these claims to the Texas Court of Criminal Appeals.

Petitioner has also failed to demonstrate the need to prevent a miscarriage of justice. This exception is "confined to cases of actual innocence, 'where the petitioner shows, as a factual matter, that he did not commit the crime of conviction.'" *Fairman v. Anderson*, 188 F.3d 635, 644 (5th Cir. 1999) (quoting *Ward v. Cain*, 53 F.3d 106, 108 (5th Cir. 1995)). To establish the required probability that he was actually innocent, a petitioner must support his allegations with new, reliable evidence that was not presented at trial and must show it was more likely than not that no reasonable juror would have convicted him in light of the new evidence. *Id.* (citing *Schlup*, 513 U.S. at 327). Petitioner has presented no new, reliable evidence showing that it was

more likely than not that no reasonable juror would have convicted him. Petitioner has not overcome the state procedural bar. Accordingly, the procedural default doctrine bars federal habeas relief on these claims.

### 3. Lesser-Included Offense

Petitioner claims the trial court erred when it failed to charge the jury on a lesser-included offense. In a non-capital case, however, "the failure to give an instruction on a lesser included offense does not raise a federal constitutional issue." *Valles v. Lynaugh*, 835 F.2d 126, 127 (5th Cir. 1988); *Creel v. Johnson*, 162 F.3d 385, 390-91 (5th Cir. 1998) (same). Where a defendant is convicted of capital murder, but is sentenced to life in prison instead of death, his case is treated as a non-capital case and the failure to provide lesser-included instruction is not cognizable on habeas review. *Creel*, 162 F.3d at 390-91. Since Petitioner was convicted of capital murder and sentenced to life in prison, his lesser-included offense claim should be denied.

### 4. Ineffective Assistance of Counsel

Petitioner claims he received ineffective assistance of counsel. To sustain a claim of ineffective assistance of counsel, Petitioner must show that: (1) counsel's performance was deficient; and (2) the deficient performance prejudiced the defense so gravely as to deprive Petitioner of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In *Strickland*, the Court stated that "[j]udicial scrutiny of counsel's performance must be highly deferential" and "every effort [must] be made to eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689. Courts, therefore, must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.*

Even if counsel is proven deficient, a petitioner must prove prejudice. To prove such prejudice, Petitioner must show "a reasonable probability that the result of the proceedings would have been different but for counsel's unprofessional errors." *Crane v. Johnson*, 178 F.3d 309, 312 (5th Cir. 1999) (citing *Strickland*, 466 U.S. at 694). "[T]he mere possibility of a different outcome is not sufficient to prevail on the prejudice prong." *Id*. "Rather, the defendant must demonstrate that the prejudice rendered sentencing 'fundamentally unfair or unreliable.'" *Id*. (quoting *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993)).

Petitioner claims he received ineffective assistance of trial counsel when counsel failed to: (1) convey plea bargain offers; (2) file motions; (3) make an opening statement; (4) call a psychiatrist as an expert witness; (5) object and preserve error regarding the trial court's failure to communicate a jury note; and (6) object to the application paragraph in the jury charge.

Petitioner claims his counsel failed to inform him that the prosecutor made a plea offer before trial. On state habeas review, his counsel submitted an affidavit stating:

> Mr. Taylor consistently maintained that he was not guilty of this offense. Therefore, there were never any serious plea bargain discussions with the state. If Mr. Taylor had ever indicated that he was willing to plead guilty to a lesser charge and accept some time, I would have tried to negotiate a plea bargain.

*Ex parte Taylor,* Supp. at 22. Petitioner has failed to show that the State made any plea offer. This claim should therefore be denied.

Petitioner claims his counsel filed "nonexistent motions." He states his counsel did not file any motions until he filed a grievance against her, and that she filed two motions that did not apply to his case. On state habeas review, his counsel filed an affidavit stating that she filed numerous pretrial motions. Petitioner fails to state what motion or motions his counsel should

have filed and has failed to show how the motion or motions would have likely changed the outcome of the trial. Petitioner's claims should be denied.

Petitioner claims his trial counsel was ineffective when she failed to make an opening statement. On state habeas review, counsel stated she did not make an opening statement for strategy reasons. Petitioner has failed to show that his counsel's conduct fell outside of reasonable trial strategy. *See Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir. 1992).

Petitioner claims his counsel was ineffective when she failed to call a psychiatric expert. Petitioner states he was examined by a psychiatric expert, but the expert was not called to testify. Petitioner claims the expert could have testified regarding his childhood abuse. On state habeas review, trial counsel stated she did not call the psychiatric expert to testify because the expert could not offer any admissible testimony. In this case, there was no punishment phase because once Petitioner was found guilty, he received an automatic life sentence. Petitioner has not explained how the expert testimony regarding his childhood would have been admissible during the guilt/innocence phase of the trial. Petitioner's claim should be denied.

Petitioner claims his counsel was ineffective when she failed to require that the trial court comply with Texas Code of Criminal Procedure articles 36.27, 36.13, 36.28 and 38.05. Article 36.27 requires that the court answer any jury question in writing, that the court attempt to have the defendant and his counsel present, and that the court give the defendant and his counsel opportunity to object to the court's response to the jury.

On state habeas review, trial counsel responded as follows:

My recollection is that the jury sent out a note asking if they could convict Mr. Taylor of a lesser included offense. I recall that I asked for a lesser included offense instruction, but this request was denied by the trial court. I did not request that the court follow the

procedures of article 36.27 and read the note in open court because failure to do so is not reversible error.

*Ex parte Taylor*, Supp. at 22-23. A violation of § 36.27 is not reversible error where the court does not provide the jury with additional instruction on the law. *See McGowan v. State*, 64 S.W.2d 355, 358 (Tex. Crim. App. 1984). Petitioner has failed to show his counsel was ineffective for failing to file an objection.

Petitioner has failed to allege facts regarding the other Code of Criminal Procedure provisions that he cites. Petitioner's conclusory claims should be denied.

Petitioner alleges his counsel was ineffective when counsel failed to object to the jury charge. Petitioner states the indictment stated he "unlawfully and intentionally" caused the death of Adrian Berry during the course of committing or attempt to commit robbery. He states the jury charge omitted the word "unlawfully" and stated only that he intentionally caused the death of Adrian Berry during the course of committing or attempting to commit robbery. He also states the charge included instructions on the law of parties, while the indictment did not.

On state habeas review, trial counsel submitted an affidavit stating:

> I did not object to the application paragraphs in the jury charge because the paragraphs were not objectionable.

*Ex parte Taylor*, Supp at 22-23. The law of parties is not required to be pled in the indictment. *Adames v. State*, 353 S.W.3d 854, 861 (Tex. Crim. App. 2011). Additionally, the term "unlawfully" is not an element of the charge of murder or capital murder under Texas law and was therefore not required to be included in the charge. *See* Tex. Penal Code §§ 19.02, 19.03. Petitioner has failed to show his counsel was ineffective for failing to object to the charge.

Finally, Petitioner claims he received ineffective assistance of appellate counsel when counsel "failed to raise an obvious and significant issue on appeal which would have resulted in reversal on Taylor's conviction." (Mem. at 2.) Petitioner, however, fails to state what claim his counsel failed to raise and why it would have resulted in reversal of his conviction. Petitioner's conclusory claim is without merit and should be denied. *See Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983) (emphasizing that mere conclusory allegations do not raise constitutional issues in habeas proceedings).

5. **Summary**

Petitioner is lawfully restrained because he has failed to prove that he has been denied a constitutionally protected interest. Accordingly, the state courts' decision to deny relief is not contrary to or does not involve an unreasonable application of clearly established federal law and is not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

**IV. Recommendation**

For the foregoing reasons, the Court recommends that Petitioner's habeas corpus petition pursuant to 28 U.S.C. § 2254 be denied with prejudice for failure to make a substantial showing of the denial of a federal right.

Signed this 7 day of March, 2017.

_____
PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this report and recommendation must file specific written objections within 14 days after being served with a copy. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. See *Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).